UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20 CV 1504 RWS |
| | ) | |
| SAINT CHARLES COUNTY, | ) | |
| MISSOURI, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Kevin Jackson ("Jackson") was employed by Defendant Saint Charles County, Missouri ("the County") from 2002 until 2019.  On October 16, 2020, Jackson filed a complaint against the County, alleging that he experienced racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Missouri Human Rights Act, Section 2013.010 R.S.Mo. *et seq*. ("MHRA") while working as a County police officer.  The County has moved for summary judgment. For the reasons explained below, I will grant the County's motion.

## LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Med. Ctr.–West Campus, 160 F.3d 484, 486 (8th Cir. 1998)

(citing Fed. R. Civ. P. 56(c)).  The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof.  Id. at 324.  In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy.  Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).[1]

Because direct evidence of employment discrimination is rare, most cases rely on circumstantial evidence.  In the absence of direct evidence of discrimination, courts employ the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (Title VII case).  Under this burden-shifting analysis, the plaintiff must first establish a prima facie case of intentional discrimination.  Id. at 802; Bashara v. Black Hills Corp., 26 F.3d 820, 823 (8th Cir. 1994).  If the plaintiff

---

[1] In his opposition brief, Jackson recites the principle that summary judgment should rarely be granted in employment discrimination cases, citing Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818 (Mo. banc 2007) in support.  While this was once the law, there is now "no discrimination case exception to the application of summary judgment."  Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (citations omitted).

establishes a prima facie case, a presumption of discrimination is established and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802.  The defendant need not persuade the court that the articulated reason was the basis of the employer's action; rather, it must simply provide some evidence of a non-discriminatory reason or reasons for its action.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993).

Upon the proffer of such evidence, the presumption of discrimination established by the prima facie case "simply drops out of the picture."  Id. at 510-11. The burden then shifts back to the plaintiff to prove that the reason articulated by the employer was really a pretext for discrimination.  Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1316 (8th Cir. 1996).  A rejection of the employer's proffered non-discriminatory reason by itself or combined with elements of the prima facie case may be enough to establish, but does not compel, an inference of intentional discrimination.  St. Mary's Honor Center, 509 U.S. at 511.

The burden of proving discrimination remains on the plaintiff at all times.  Id. at 515-16.  It is not enough to merely discredit the defendant's articulated reason for the adverse employment action.  A plaintiff must always establish that the real reason for the defendant's action was impermissible discrimination.  Id.; see also Huston v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir. 1995).  To avoid summary

judgment, a plaintiff must present evidence that, when viewed in its entirety: (1) creates a fact issue as to whether the employer's proffered reason is pretextual, and (2) creates a reasonable inference that a discriminatory motive was a determinative factor in the adverse employment decision.  Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996).

## BACKGROUND

Jackson, who is African American, was employed by the County from 2002 until October 2019.  He worked for the County Department of Corrections from 2002 until 2007 and then transferred to the County Sheriff's Department.  When the Sheriff's Department reorganized into two entities in 2015, Jackson transferred to the County Police Department, where he remained until his resignation on October 30, 2019.  [Doc. # 23-6, Ex. F].  During his entire tenure with the County, Jackson applied for one special assignment and received it.  [Doc. # 31-1, Ex. 1, Jackson Dep. 180:22-25].  At the end of his career with the County, he held the rank of patrolman.  [Id. at 59:13].

On October 21, 2019, Captain Christopher Hunt, who served as the Department's Commander of the Bureau of Administrative Services, delivered a Notice of Proposed Severe Discipline to Jackson.  [Doc. # 23-4, Ex. D, Hunt Aff. ¶ 3-4].  The notice informed Jackson that he faced termination as a result of violating multiple departmental policies, including neglect of duty, lying to a supervisor, and

failure to obey orders.  [Id. at ¶ 4; Doc. # 23-5, Ex. E].

The County initially issued the Notice of Proposed Severe Discipline because Jackson filed two late reports.  [Doc. # 23-5, Ex. E].  Officers are supposed to complete reports within 24 hours after they are drawn; failure to do so constitutes a violation of departmental policy.[2]  [Doc. # 31-1, Ex. 1, Jackson Dep. 81:1].  Jackson acknowledges that he did not file all of his reports within the 24-hour timeframe.  However, he contends, and the County admits, that officers do not always file their reports on time.  When this happens, "supervisors would usually leave a note on the overdue screen of the report writing system to get the report done ASAP."  [Doc. # 28, ¶ 33].

When Captain Koch contacted Jackson about scheduling a meeting with Captain Hunt to discuss his policy violations, Jackson asked if the meeting was about the fact that he had taken his patrol car out of St. Charles County.  [Doc. # 23-5, Ex. E].  Officers who live outside St. Charles County are not supposed to bring their patrol cars home.  [Doc. # 31-1, Ex. 1, Jackson Dep. 87:5-9; Doc. # 31-6, Ex. 6, Hunt Dep. 32:9-11].  During his meeting with Captain Hunt, Jackson admitted that he had committed this additional policy violation, as he started driving his patrol car home after he moved out of St. Charles County at some point in 2019.  [Doc. # 23-5, Ex.

---

[2] At one point in his deposition, Jackson stated that submitting reports within 24 hours was a "recommendation and was not part of the true policy forms at the time," before admitting that the "recommendation" was included in the Department's "General Orders," which all officers are expected to follow.  [Doc. # 31-1, Ex. 1, Jackson Dep. 80:5-8, 22].

E; Doc. # 31-1, Ex. 1, Jackson Dep. 87:5-14].

According to the Notice of Proposed Severe Discipline, Jackson told a supervisor, Sergeant Gary Bradshaw, that he had been parking his patrol car at the St. Charles City Police Department instead of bringing it to his new home.  [Doc. # 23-5, Ex. E].  Lying to a supervisor is a serious policy violation.  [Doc. # 31-1, Ex. 1, Jackson Dep. 88:13-16].   However, Jackson disputes that he lied to Sergeant Bradshaw.  [Doc. # 26, ¶ 15].  In his deposition, Jackson testified that while he and Sergeant Bradshaw discussed his move out of St. Charles County, he did not remember saying that he was "parking [his patrol car] at St. Charles City PD," and thought that Sergeant Bradshaw might be "misremembering" details of the conversation.  [Doc. # 31-1, Ex. 1, Jackson Dep. 87:23-25, 88:1-12].

During his meeting with Captain Hunt, while attempting to explain that he did not always submit reports on time because of computer issues, Jackson revealed that he committed another policy violation: disregarding the official procedure for contacting the IS Helpdesk.  [Doc. # 23-5, Ex. E].  Although Jackson was aware of the steps he should have taken to seek help with his computer, he did not follow that procedure and instead texted an IS Department employee, Cyndi Lucas, for direct assistance. [Id; Doc. # 31-1, Ex. 1, Jackson Dep. 85:11-24].

After Jackson's meeting with Captain Hunt, the County discovered that he had committed additional policy violations.  An inventory of Jackson's patrol car

revealed that he did not complete a report about an assault involving two juveniles and an airsoft gun.  [Doc. # 23-5, Ex. E].  The car also contained 43 violator copies of warning tickets, which led the County to believe that Jackson did not issue the tickets to the cited drivers.  He also had not completed the state-mandated racial profiling reports in connection with 39 of those tickets.  Additionally, the car contained 16 written Uniform Citations.  According to the County, warrants were issued for four drivers who did not receive copies of their citations and as a result, failed to appear in court at the proper date and time.  Jackson partially disputes these allegations, admitting that he investigated the assault incident and did not write a report because the complaining witness decided she did not want one filed.  [Doc. # 31-1, Ex. 1, Jackson Dep. 89:20-25, 90:1-6].  He also testified that he gave each driver a copy of their citation or ticket and that the car contained carbon copies of the tickets that he wrote and distributed.  [Id. at 49:16-25].

Before October 2019, Jackson received discipline on twelve other occasions. [Doc. # 23-5, Ex. E].  He was disciplined for, among other things, being involved in a collision while not wearing a seatbelt [Doc. # 31-1, Ex. 1, Jackson Dep. 49:16-25, 50:1-3]; having an unauthorized passenger in his patrol car [Id. at 94:22-25, 95:1-2]; improperly disposing of seized property [Id. at 94:5-7]; and refusing to submit to a polygraph test in connection with an internal affairs investigation.[3]  [Id. at 97:4-11].

---

[3] The investigation, which occurred in 2017, was prompted by a domestic dispute involving Jackson and his ex-girlfriend.  [Doc. # 31-1, Ex. 1, Jackson Dep. 95:17-25, 96:1-15].   All

In his deposition, Jackson affirmed that, to his knowledge, the table summarizing his discipline history in the Notice of Proposed Discipline "contain[s] all of the discipline that [he] would have received during [his] time as…either a sheriff's deputy or a police officer with St. Charles County." [Id. at 93:16-20]. He further testified that he could not "recall the specific incident" underlying the written counseling violation he received in 2011.[4] [Id. at 98:6-7].

Following his meeting with Captain Hunt, Jackson met with Chief David Todd. He was given the opportunity to resign instead of facing termination. [Doc. # 23-7, Ex. G, Todd Aff. ¶ 7]. Jackson did not believe that the County adequately investigated all of the charges against him. [Doc. # 26, ¶ 8]. However, he elected to resign, choosing not to appeal the allegations in the Notice of Proposed Severe Discipline before the County's Merit Commission, after realizing that both the captain and the chief supported his termination. [Doc. # 31-1, Ex. 1, Jackson Dep. 178:15-17]. In its Statement of Uncontroverted Material Facts, the County represented that at least six employees have been permitted to resign in lieu of facing termination since 2015, and Jackson was the only African American in this group. [Doc. # 23, ¶ 27]. However, the County later admitted that at least one other African

---

allegations were ultimately dismissed, aside from the allegation that Jackson improperly disposed of evidence. [Id. at 95:19-24].

[4] Jackson's response to the County's SUMF thus misrepresents his own deposition testimony, as he stated that he testified he could not recall receiving *any* of the disciplinary action. [Doc. # 26, ¶ 18].

American officer, Kevin Couty, was allowed to resign under similar circumstances. [Doc. # 28, ¶ 48].

## ANALYSIS

I.    *Title VII*

a.  *Disparate treatment*

In his complaint, Jackson asserts a disparate treatment claim based on race discrimination under Title VII, 42 U.S.C. § 2000e, *et seq.*  Jackson asserts that he suffered an adverse employment action when he was given the option to resign or be fired.  He argues that he was treated differently than Caucasian employees who were not disciplined or asked to resign after engaging in similar, or worse, inappropriate workplace behavior.

"Title VII prohibits employers from discharging an employee because of race or gender and from treating employees differently with respect to the 'terms, conditions, or privileges' of employment."  Palesch v. Mo. Comm'n on Hum. Rts., 233 F.3d 560, 568 (8th Cir. 2000) (quoting 42 U.S.C. § 2000e-2(a)(1)).  To establish a prima facie case for a disparate treatment claim, Jackson must show that: (1) he is a member of a protected class; (2) he was meeting the legitimate expectations as to his duties; (3) he suffered an adverse employment action; and (4) circumstances give rise to an inference of discrimination because similarly situated employees, who

were not members of the protected group, were treated differently.  Gilooly v. Mo. Dep't of Health & Senior Servs., 421 F.3d 734, 737-39 (8th Cir. 2005).

As an African American, Jackson is a member of a protected class.  He admits to committing minor policy violations, thus appearing to agree with the County's assertion that he was not meeting the legitimate expectations as to his duties. However, he also contends that Caucasian officers engaged in similar, or worse, behavior but were never reprimanded, indicating that such violations were routinely tolerated.  The County admitted that the policy requiring the timely submission of reports was not always strictly enforced.  [Doc. # 28, ¶ 33].  This suggests that an officer could occasionally fail to submit reports within the 24-hour timeframe and still be in good standing with the County.  However, the record does not reflect that the County tolerated officers committing the other violations that Jackson did.

The County argues that even if I assume that Jackson was performing his job in accordance with the County's legitimate expectations, he did not suffer an adverse employment action because he voluntarily resigned from his position.  Jackson contends that his resignation was not voluntary because it "occurred under notice of imminent termination."  Evidence in the record supports this characterization; Chief Todd testified that he told Jackson during their meeting that "[termination] was [Todd's] path, that [Todd] was done."  [Doc. # 31-5, Ex. 5, Todd. Dep. 38:8-9].

However, even assuming that Jackson did suffer an adverse employment

action, his claim fails because he has not identified a similarly-situated employee, who is not a member of a protected class, who was treated more favorably. As will be discussed in more detail below, Jackson has named officers who committed *some* of the same violations that he did; however, he has not identified any officer who committed *all* of the violations that he did. The record does not reference any officer who, like Jackson, submitted late reports; took a patrol car out of St. Charles County; lied to a supervisor; disregarded departmental procedure for seeking help with computer issues; failed to issue tickets; transported an unauthorized passenger; improperly disposed of seized items; refused to submit to a polygraph test; and was involved in a car accident while not wearing a seatbelt.

Jackson alleged that "several people" directly texted IS Department employees instead of following the County's procedure for seeking help with computer problems. [Doc. # 31-1, Ex. 1, Jackson Dep. 85:11-20]. However, he did not identify any specific officers. He also did not identify any specific officers who improperly disposed of seized items. There is no evidence in the record to support his allegation that Caucasian officers committed those violations but were not reprimanded.

Jackson's own deposition testimony contradicts his allegation that Caucasian officers also took their patrol cars out of the County but were not disciplined. He admitted that a Caucasian officer, Shawn Birdsong, was removed from a drug task

force after the County discovered that he had taken his car to Florida for vacation. [Doc. # 31-1, Ex. 1, Jackson Dep. 53:22-25, 54:1-3].[5]  While Jackson also alleged that one other Caucasian officer committed this violation without reprimand, nothing in the record—including the affidavit that Jackson specifically cites in support— identifies any such officer.

Similarly, Jackson alleged that one Caucasian officer, Scott Ginnever, transported an unauthorized passenger in his patrol car without receiving any discipline. [Id. at 118:16-23].  However, he also testified that he knew a supervisor told Ginnever to drive the passenger home, thus appearing to admit that the passenger was authorized to be in the car. [Id. at 19-23].  Jackson did not identify any other officers who had unauthorized passengers in their cars.

The record contains several references to officers who were involved in car accidents.  Jackson identified two Caucasian officers, Tony Jones and Adam Caupp, who he alleged were not wearing their seatbelts when they were involved in an accident. [Id. at 49:1-3].  According to the County, an internal investigation revealed that Jones, who had been driving, was not at fault. [Doc. # 31-4, Ex. 4, Sullivan Dep. 104:20-24].  Jackson also identified Kevin Couty, an African American officer who was made to drive an old Crown Victoria for a year after he was involved in an

---

[5] Jackson admits that removal from a drug task force is considered a disciplinary action.  [Doc. # 31-1, Ex. 1, Jackson Dep. 54:16-20].  Lieutenant Curtis Sullivan testified at his deposition that "6 percent of [Birdsong's] pay was reduced for four pay periods" as additional punishment for this incident.  [Doc. # 31-4, Ex. 4, Sullivan Dep. 106:6-8].

accident. [Doc. # 31-1, Ex. 1, Jackson Dep. 45:14-20, 46:8; Doc. # 26-21, Ex. 21, Couty Aff. ¶ 12]. Finally, Lieutenant Curtis Sullivan, who is involved in the County's internal affairs investigations, testified that a Caucasian officer, Lieutenant Ryan Streck, was disciplined after his car rolled into a fire truck. [Doc. # 31-4, Ex. 4, Sullivan Dep. 104:1-10].

Jackson named two Caucasian officers who did not finish reports within the required 24-hour period: Nick Martin, who allegedly violated the policy "at least once," and Captain Hunt, who allegedly filed a report three months late. [Doc. # 31-1, Ex. 1, Jackson Dep. 131:10-21, 146:18-21]. He alleged that Captain Hunt was also not disciplined for watching pornography at work [Id. at 18:17-23] and was allowed to keep working for the County even after he was convicted of burglary, assault, and property damage.[6] [Id. at 36:16-19, 38:20-21, 39:1-7]. He named a Caucasian officer, Amanda Hopkins, who lied to a sergeant, an allegation that the County denies. [Doc. # 28, ¶ 14]. He identified two Caucasian officers, Ryan Streck and Sergeant Jett, who were not disciplined for sexually harassing and/or sexually and physically assaulting female officers. The County denies that these events ever took place. [Doc. # 28, ¶ 13, 39].

Finally, Jackson alleged that Caucasian officers under internal investigation are not required to take polygraph exams, and that only he, Omid Hamzehzadeh, and

---

[6] The Missouri Supreme Court overturned Hunt's conviction and he pleaded no contest to a peace disturbance charge when the case was remanded. [Doc. # 31-6, Ex. 6, Hunt Dep. 58:4-25].

Thomas Tumbrink were ever forced to take a polygraph exam.[7]  He also alleged, and the County admits, that Chief Todd was not forced to take a polygraph exam after he was accused of sexual harassment.  [Doc. # 28, ¶ 19].  Chief Todd testified that polygraph tests were done and that an officer who refused to take one could face termination as a consequence.  [Doc. # 31-5, Ex. 5, Todd Dep. 22:12-20].  He identified one officer, Dave Adams, who he believed was possibly terminated for refusing to submit to a test.  [Id. at 22:25, 23:1].

The County objects to many of the incidents that Jackson has described, emphasizing that, by his own admission, he gleaned much of this information from the department "rumor mill" and lacks personal knowledge of relevant details.  Regardless, Jackson has not produced any evidence to show that the officers he has specifically identified were similarly situated to him.  He has not produced any evidence of their personnel records to show that they were disciplined for any additional violations.  Furthermore, he has not produced any evidence indicating that these officers reported to the same supervisor, or held the same rank, that he did.  See Bennett v. Nucor Corp., 656 F.3d 802, 819 (8th Cir. 2011) ("In a case involving allegations of discriminatory disciplinary practices, for example, this court explained that '[t]o be similarly situated, the comparable employees must have dealt with the

---

[7] In his deposition, Captain Hunt stated that Tumbrink and "Hanzanada" were asked to take polygraph exams and that he was "sure there are some more [officers]."  [Doc. # 31-6, Ex. 6, Hunt Dep. 20:8-11].  It is unclear if "Hanzanada" is Omid Hamzehzadeh or a different individual.

same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances'") (quoting <u>Tolen v. Ashcroft</u>, 377 F.3d 879, 882 (8th Cir. 2004)).

Even if Jackson had established a prima facie case, the County has come forward with a legitimate, non-discriminatory reason for seeking severe discipline against him.   Jackson's disciplinary history prompted the County's decision to terminate him or allow him to resign.   At this point, the presumption of discrimination established by a prima facie case "simply drops out of the picture." <u>St. Mary's Honor Center</u>, 509 U.S. at 510.  Jackson argues that this ground for the County's decision was a pretext.   In support, he cites examples of other non-Caucasian officers who, like him, were disciplined for committing policy violations, and argues that Caucasian officers were not disciplined for engaging in the same behavior.   But as discussed previously, he has not produced evidence showing that similarly-situated Caucasian officers were in fact not disciplined for similar behavior.   Furthermore, despite arguing that the charges against him were not adequately investigated, he admitted to committing all of the policy violations, aside from lying to a supervisor—which he said he "did not recall" doing—and failing to issue tickets.  Jackson's allegations therefore fail to create a reasonable inference that a discriminatory motive was a determinative factor in the County's decision to allow him to resign in lieu of facing termination.

Jackson's Statement of Additional Uncontroverted Material Facts cites statistical information from the United States Census Bureau to demonstrate that African Americans are underrepresented in the County police department, comparing the number of African American County employees to the total populations of African American residents in St. Louis City, St. Louis County, and St. Charles County.  [Doc. # 26, ¶ 61-71].  The County argues that Jackson's comparison is inappropriate and uninformative, as the numbers he cites include "children, the elderly and infirm" who would be categorically ineligible for employment.  The County also accuses Jackson of "attempt[ing] to inflate the alleged disparity by using the entirety of the St. Louis Region and not [only] St. Charles County."  Finally, the County argues that Jackson has not identified a specific employment practice that he believes is discriminatory and when relying on statistical evidence to establish a prima facie case of discrimination, "the plaintiff's burden…goes beyond the need to show that there are statistical disparities in the employer's work force.  The plaintiff must begin by identifying the specific employment practice that is challenged."  Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994 (1988).

The United States Supreme Court has recognized that "gross statistical disparities…alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."  Hazelwood Sch. Dist. v. United States, 433 U.S. 299,

307-08 (1977).  However, I find that the statistical disparities cited do not constitute prima facie proof of discrimination in this case.  The comparisons provided hold little probative value.  Id. at 308 n. 13 (explaining that comparisons between a specific workforce and the general population are appropriate in situations when "the job skill involved…is one that many persons possess or can fairly readily acquire," but "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value"); see also Watson, 487 U.S. at 997 ("statistics based on an applicant pool containing individuals lacking minimal qualifications for the job would be of little probative value").  Furthermore, as the County notes, Jackson has failed to identify a specific allegedly discriminatory employment practice and has not explained how the information cited is relevant to his claim of disparate treatment.

As a result, I find that the County is entitled to summary judgment on this claim.

### b.  Hostile work environment

Jackson's complaint also alleges that he was "subjected to a hostile work environment due to his race and color."  "Hostile work environment harassment occurs when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'" Palesch, 233 F.3d at 566 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  A court must keep in mind that "[n]ot all unpleasant conduct creates a hostile work environment." Id. at 567 (citation omitted).  The conduct at issue must not be merely rude or unpleasant or involve a few isolated incidents.  Blomker v. Jewell, 831 F.3d 1051, 1057 (8th Cir. 2016).  The harassment must be "so intimidating, offensive, or hostile that it poisoned the work environment." Id. (citation omitted).  The conduct at issue must be severe or pervasive enough to be an objectively hostile environment.  Harris, 510 U.S. at 21.  "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (citing Harris, 510 U.S. at 23).  In addition, the plaintiff must subjectively perceive the environment to be abusive.  Harris, 510 U.S. at 21.  A court must look at all of the attendant circumstances, including the frequency of the purported harassment; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance.  Willis v. Henderson, 262 F.3d 801, 809 (8th Cir. 2001).

The County argues that Jackson did not mention a hostile work environment claim in his charge filed with the EEOC and as a result, cannot bring this claim in this Court.  Richter v. Advance Auto Parts, Inc., 686 F.3d 847, 850 (8th Cir. 2012).

In response, Jackson contends that allegations of "disparately applied reprimands establish a hostile work environment."

In his EEOC charge, Jackson stated:

> There is a pattern and practice of discrimination against minorities within the count[y] police department.  Out of 100 police officers there are only approximately six minorities.  There are no minorities over the rank of patrolman.  The field training officers, sergeants, lieutenants, captains and chief are all Caucasian.

> There is a biased enforcement of orders and policies against the minorities verses [sic] the Caucasian officers.  Caucasian police officers are routinely not reprimanded for violations of policies and laws and persons of color are reprimanded and even terminated for minor policy violations…

> I was recently forced to resign because I failed to turn in reports within 24 hours and other minor order violations.  Similar violations were common occurrences within the department and Caucasian officers are not reprimanded or forced to resign because of them…

> The department has discriminated against me because of my color, and race.

[Doc. # 23-3, Ex. C].

Even liberally construing the charge and assuming that it could be interpreted to allege the existence of a hostile work environment, Jackson has failed to present evidence that would support such a claim.  I have already addressed his claims about allegedly discriminatory policy enforcement in detail and found that the evidence in the record does not support his allegations.  As a result, there is no evidence to support a finding of a hostile work environment on these grounds.

Jackson testified that no one in County administration made disparaging comments or remarks about his race to him or to any other African American officers.  [Doc. # 31-1, Ex. 1, Jackson Dep. 75:3-10].  Nothing in the record indicates that any of Jackson's coworkers made these kinds of comments to him either.[8]  I find that Jackson has failed to present evidence that would support his claim of a hostile work environment.  As a result, I will grant the County summary judgment on this claim.

---

[8] Jackson's response to the County's SUMF thus partially misrepresents his deposition testimony. He stated that "[d]isparaging remarks were made" and cited Kevin Couty and Omid Hamzehzadeh's affidavits in support.  [Doc. # 26, ¶ 26].  These affidavits, like the affidavits and complaints that Jackson submitted from other non-Caucasian officers, include allegations that some unnamed officers refused to speak to an African American officer [Doc. # 26-19, Ex. 19, Lotts Aff. ¶ 14-15]; some unnamed officer(s) put McDonald's applications in the mailbox of a Hispanic officer but not in the mailboxes of any Caucasian officers [Doc. # 26-20, Ex. 20, Santos Aff. ¶ 8]; an unnamed officer asked an African American officer, but not any Caucasian officers, if he knew how to swim [Doc. # 26-21, Ex. 21, Couty Aff. ¶ 19]; and some unnamed officers called an Iranian officer racially derogatory names, including "haji," "bomb maker," and "sand n-----." [Doc. # 26-18, Ex. 18, Hamzehzadeh Aff. ¶ 10].

The County objects to my consideration of this evidence, arguing that many of the allegations are inadmissible hearsay.  Even assuming that this evidence crosses the threshold of admissibility, these allegations do not establish that Jackson himself experienced a hostile work environment, as there is no evidence thar he was aware of these comments when they were made.

Jackson also submitted petitions from two other lawsuits filed against the County by Holly Magdziarz and Megan Murray, who worked as attorneys for the County.  Both petitions allege sexual harassment by Chief Todd and former County Counselor Keith Hazelwood.  They do not contain any allegations related to Jackson's claim of a racially discriminatory workplace environment.

## II.      § 1981 and Missouri Human Rights Act

As previously discussed, Jackson has failed to carry his burden to show that the County's proffered reason for its decision to recommend termination or allow him to resign was pretext.  His § 1981 and MHRA claims therefore fail as well.[9]

Accordingly,

**IT IS HEREBY ORDERED that** Defendant St. Charles County's motion for summary judgment, [22], is **GRANTED**.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 25th day of January, 2022.

---

[9] The County argues that Jackson's § 1981 claim fails as a matter of law because he did not state a claim for relief under 42 U.S.C. § 1983.  Jackson did not address this argument in his opposition brief and I need not discuss it in detail here; however, I have previously followed Lockridge v. Bd. of Trustees of Univ. of Ark., 315 F.3d 1005, 1007 (8th Cir. 2003) and liberally construed § 1981 claims as if they were brought under § 1983.